MENNEMEIER, GLASSMAN & STROUD LLP
ANDREW W. STROUD (SBN 126475)
KELCIE M. GOSLING (SBN 142225)
980 9th Street, Suite 1700
Sacramento, California 95814
Telephone: 916-553-4000
Facsimile: 916-553-4011
stroud@mgslaw.com

Attorneys for Petitioners
Jessica Tavares, Dolly Suehead,
Donna Caesar and Barbara Suehead

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JESSICA TAVARES, DOLLY SUEHEAD, DONNA CAESAR and BARBARA SUEHEAD, unlawfully banished members of the United Auburn Indian Community,

Petitioners,

vs.

GENE WHITEHOUSE, CALVIN MOMAN, BRENDA ADAMS, JOHN WILLIAMS and DANNY REY, in their official capacity as members of the Tribal Council of the United Auburn Indian Community,

Respondents.

CASE NO.:

**PETITION FOR WRIT OF HABEAS CORPUS UNDER INDIAN CIVIL RIGHTS ACT [25 U.S.C. § 1303]**

Petitioners seek a writ of habeas corpus under the Indian Civil Rights Act of 1968 (25 U.S.C. §§ 1301-1303) for relief from the unlawful restraints on their liberty imposed by orders of banishment issued under a seditious libel ordinance. Petitioners have been banished from coming onto all tribal lands and from participating in any tribal activities, including running as candidates for election, for periods ranging from two to ten years. They have also been fined individually for tens of thousands of dollars by orders expropriating all per capita income they are entitled to as tribal members for periods ranging from six months to four years. These punitive sanctions were so severe as to deprive petitioners of their liberty, and were taken in retaliation for their exercise of core political speech, in violation of federal guarantees to freedom of speech, due process and equal protection. This Court is the only forum available to test the legality of these actions. Accordingly, petitioners present the following statement of their claims entitling them to relief:

## INTRODUCTION

1. Petitioners are four members of the federally recognized United Auburn Indian Community (the "UAIC" or "Tribe"). They seek judicial relief from the severe punishment imposed upon them by the Tribe's five-member governing body, the Tribal Council, in retaliation for criticizing then-incumbent members of the Tribal Council (collectively, the "2011 Tribal Council" or "Tribal Council") in connection with a November 2011 election recall effort. Petitioners' recall effort was authorized by the Tribe's constitution and directed at removing members of the 2011 Tribal Council from office. Specifically, petitioners took issue with several decisions made by the 2011 Tribal Council, including its refusal to seek restitution of $25 million in tribal gaming revenues paid to the Tribe's counsel, Howard Dickstein ("Dickstein") under an illegal contract he wrote for his unjust enrichment and convinced the Tribal Council to sign, to the great detriment of the Tribe.

2. Despite guarantees in federal law protecting petitioners from punishment for engaging in political speech, the 2011 Tribal Council summarily deemed petitioners' speech "defamatory" under an ordinance that Dickstein drafted and urged the Tribal Council to adopt – an ordinance whose language echoes the infamous Alien and Sedition Acts of 1798 (1 Stat. 596).

Without providing meaningful notice or opportunity for petitioners to be heard, the 2011 Tribal Council summarily sentenced them to years of banishment from all tribal lands, stripped them of all rights associated with membership (including the right to run for election to any tribal office), and imposed severe sanctions upon them by curtailing hundreds of thousands of dollars in financial benefits to which all other tribal members are entitled.

3. The 2011 Tribal Council inflicted this criminal-like punishment on petitioners so as to maintain complete and unquestioned control over the Tribe and its assets. Among other reasons, the 2011 Tribal Council members and Dickstein wanted to conceal their unauthorized transfer of tribal assets to a secret escrow account ("slush fund") designed to benefit them personally at the Tribe's expense. As petitioners would later learn, the 2011 Tribal Council and Dickstein diverted millions of dollars in tribal funds to this secret, irrevocable slush fund held by the San Francisco branch of U.S. Bank. Petitioners are informed and believe, and thereon allege, that the 2011 Tribal Council members can access this fund if they are ever ousted from office, disenrolled from the Tribe, removed from the Tribal Council, denied their per capita distributions of gaming revenues or sued by the Tribe for their malfeasance in office. In addition, the slush fund inures to the direct benefit of Dickstein and a former Tribal Administrator who is under indictment by the federal government for embezzling millions of dollars from the Tribe (and is now in private, closed arbitration proceedings to enforce his right to use slush fund monies to pay for his defense of the criminal embezzlement indictment against him). Although neither Dickstein nor the former Tribal Administrator is a member of the Tribe, they both have the express and unlimited authority to tap the slush fund.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action for the following reason:

a. Federal question jurisdiction is conferred by 25 U.S.C. § 1303, which provides that the "privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his [or her] detention by order of an Indian tribe," and 25 U.S.C. § 1302(a)(1), which prohibits respondents from "mak[ing] or enforc[ing]

/ / /

any law . . . abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances."

b. This Court has jurisdiction over all respondents, who collectively constitute the current Tribal Council, by virtue of congressional abrogation of sovereign immunity that otherwise would attach and pursuant to the doctrine of *Ex Parte Young.*

5. Venue is proper in this district because the events or omissions giving rise to petitioners' claims occurred within this district, and petitioners' liberties and rights have been restrained or curtailed in this district.

**PARTIES**

6. Petitioners Jessica Tavares, Dolly Suehead, Donna Caesar and Barbara Suehead (collectively, "petitioners") are enrolled members of the United Auburn Indian Community ("UAIC" or "Tribe"). Jessica Tavares is past Chairperson of the UAIC Tribal Council, having served in that capacity for thirteen years, from 1996 to 2009. Dolly Suehead, a tribal elder, also served on the Tribal Council for that same time period.

7. Respondents Gene Whitehouse, Brenda Adams, Calvin Moman, John Williams and Danny Rey (collectively, "respondents") are named in petitioners' habeas corpus petition as current members of the Tribal Council empowered to provide the relief and implement the federal court order petitioners seek for their claims under the Indian Civil Rights Act. Three of the respondents – Gene Whitehouse, Brenda Adams and Calvin Moman – were members of the 2011 Tribal Council that took the punitive actions described in this petition. The remaining members of the 2011 Tribal Council – David Keyser and Kim DuBach – no longer hold tribal office, having been replaced by respondents John Williams and Danny Rey. Respondents John Williams and Danny Rey took no part in the actions giving rise to this petition.

**FACTUAL ALLEGATIONS**

**The Petition to Recall the 2011 Tribal Council from Office**

8. On November 7, 2011, petitioners submitted a petition to the UAIC Tribal Election Committee (the "EC"), seeking to recall each of the 2011 Tribal Council members – Gene Whitehouse, Brenda Adams, Calvin Moman, David Keyser and Kim DuBach – from the

Tribal Council (the "Recall Petition"). The EC is subject to appointment by and control of the five-member Tribal Council. As a result, the Recall Petition was essentially submitted to and controlled by the same Tribal Council members to whom the recall effort was directed. In addition, petitioners Jessica Tavares and Dolly Suehead were running for Tribal Council in the regularly scheduled election to be held one month later, in December 2011. In that election, Tavares and Suehead challenged two of the 2011 Tribal Council members who were running for reelection.

9. The Recall Petition consisted of identically worded petitions signed by approximately seventy-four voting tribal members, which petitioners believe constituted 40% of the tribal membership as required for recall under the Tribe's constitution. Each petition was certified by a declaration from a tribal member who circulated it among other members for their signatures. Article VI, section 2 of the Tribe's constitution states that "[u]pon receipt of a petition signed by at least forty percent (40%) of the qualified voters of the United Auburn Indian Community, it shall be the duty of the Election Committee established by this Constitution to call and conduct within thirty (30) days an election to consider the recall of an elected official."

10. The Recall Petition stated grievances of the petitioning tribal members, including, inter alia, criticism of the following actions and decisions by the 2011 Tribal Council:

a. Representing to members of the Tribe that a full, independent, forensic audit had been conducted of the Tribe's financial commitments – including commitments to all outside consultants, lawyers, lobbyists and business partners – when they knew or should have known this was untrue.

b. Denying tribal members access to the limited audit that was conducted, and further denying tribal members the opportunity to otherwise review the Tribe's finances, including the finances of its casino, Thunder Valley.

c. Refusing to properly address "unjust enrichment" issues related to the compensation paid to the Tribe's outside legal counsel, Howard Dickstein, and his firm, Dickstein & Zerbi (now the Dickstein Law Firm). Specifically, the 2011 Tribal Council members refused to take action to reclaim or obtain restitution of almost $25 million paid to Dickstein and

his firm over five years pursuant to an illegal contract guaranteeing attorney fees equaling 2% of Thunder Valley's net gaming revenue.

d. Engaging in "prior restraints" of political communications by maintaining the exclusive address list of tribal members, refusing to provide that list to other tribal members running for election to tribal office, opening and reading all political communications to tribal members from petitioners and others running for tribal office, and refusing to mail any such communications they deemed critical of the incumbent Tribal Council.

e. Interfering with the observation and monitoring of past tribal elections.

**The 2011 Tribal Council Rejects the Recall Petition and Retaliates Against Petitioners**

11. Because the 2011 Tribal Council refused to release the mailing addresses of Tribe members, petitioners sought to communicate their grievances to the entire tribal membership through the media in the form of a press release. Two days later, on November 9, 2011, the 2011 Tribal Council mailed a one-page statement to all tribal members, accusing petitioners of making a "public display of our tribal business in the local newspapers and on television," calling petitioners' statements in the Recall Petition and press release "defamatory and malicious" and characterizing petitioners' political speech as having a "negative impact on the reputation of our Tribe." The letter indicated that the 2011 Tribal Council "will be taking appropriate disciplinary and legal action."

12. A day later, on November 10, 2011, the EC notified petitioners that their Recall Petition was rejected on a number of grounds, including the failure to obtain the requisite support of 40% of the membership. Significantly, the EC did not indicate how many signatures were necessary to meet the 40% threshold required by the tribal constitution, which petitioners allege on information and belief was satisfied by the seventy-four signatures they and other tribal members had gathered. In addition, the EC rejected the Recall Petition on the ground that the petition did not provide a date and address for every signatory, although the EC and the Tribal Council had access to all tribal members' names and addresses for verification purposes.

/ / /

13. The 2011 Tribal Council also claimed that the Recall Petition did not comply with a newly adopted Election Ordinance, drafted by Dickstein, that required each signature on the Recall Petition to be individually witnessed by a notary public – a condition making it virtually impossible ever to recall a Tribal Council member pursuant to the tribal constitution. Although petitioners had asked the Tribal Council to provide a copy of the applicable election ordinance before they began their Recall Petition drive, they were given a version of the ordinance that did not contain the individual notarization requirement. (To this day, the Tribal Council has not decided whether tribal members may obtain copies of the resolutions and ordinances that govern them, or must instead come to the Tribal Office to inspect and read such documents but not remove or copy them.)

14. On or about the same time, former Chairwoman and petitioner Jessica Tavares denounced the rejection of the Recall Petition and stated in a press release that "anyone who challenges the Council's lawyer, Howard Dickstein, and dares to take issue with the $25 million he has bilked the Tribe, will be intimidated, punished and silenced." The press release further stated that the refusal to recognize the recall petition was "just another move by Dickstein to hold onto his power."

15. Five days later, on November 15, 2011, the 2011 Tribal Council notified petitioner Tavares that she was being disciplined for betraying the Tribe through seditious speech that allegedly put the Tribe's financial standing and security at risk. The Tribal Council purported to convict Tavares under a tribal ordinance, drafted by Dickstein, that states: "All tribal members shall have a duty to refrain from defaming the reputation of the Tribe, its officials, its employees or agents outside of a tribal forum, and where this duty is breached, shall reimburse the Tribe for any resulting costs incurred or losses."

16. Specifically, the 2011 Tribal Council advised Tavares that she was banned from all "tribal lands and facilities for a period of ten (10) years" and would lose her "per capita distributions and all other financial benefits and membership privileges" for four years. This denial of benefits amounted to about $40,000 per month, plus bonuses, based on net revenues

/ / /

from the Tribe's Thunder Valley Casino, amounting to more than $2 million over the course of the four-year period.

17. The Tribal Council sent the remaining petitioners similar letters over the next two days. Although petitioners' conduct was essentially the same, the degree of punishment varied – but in all cases petitioners' so-called "defamation" of the Tribe was punished by banishment from tribal lands and loss of per capita distributions. The 2011 Tribal Council advised petitioners that, as discipline for making allegedly defamatory statements about the Tribal Council, they were banished from all tribal land and facilities (including tribal offices, Thunder Valley Casino, the UAIC School, and health and wellness facilities at the UAIC Rancheria) and divested of all other membership privileges and benefits, including their per capita share of net revenues from casino operations.

**Petitioners Attempt to Appeal Imposition of Discipline Based on Their Protected Speech, But Are Denied Their Right to a Fair Hearing**

18. Petitioners appealed the 2011 Tribal Council's disciplinary action to the Tribal Council – the same body that imposed the sanction – as the sole avenue of redress available to challenge their sentences of banishment outside the jurisdiction of this Court. The Tribal Council set a closed meeting for November 22, 2011. Petitioners were permitted to attend and each was allotted one hour in which to explain why she should not be punished. Although petitioners were permitted to bring an attorney to the meeting, they were not allowed to present or confront witnesses. Nor were they allowed to transcribe or record the meeting in any manner. Although petitioners had requested that the Tribal Council provide them with procedures and guidelines governing the operations and conduct of the meeting, the Tribal Council provided no such information.

19. Each petitioner appeared with counsel before the 2011 Tribal Council that had already punished her. Each submitted a sworn declaration affirming that she had a good faith belief that all statements she had made in connection with the Recall Petition were true based on the information and facts of which she was aware. Further, petitioners' declarations set forth the basis for their good faith belief in the truthfulness of their political statements.

**The 2011 Tribal Council Affirms Its Imposition of Punitive Sanctions**

20. On November 29, 2011, the 2011 Tribal Council released its foreordained "Findings and Conclusions," upholding all charges contained in the previously served "Notices of Discipline and Proposed Withholding of Per Capita" and imposing the following punishment: banishment orders of two years against petitioners Dolly Suehead, Barbara Suehead and Donna Caesar, and a banishment order of ten years against petitioner Tavares. By virtue of these orders, petitioners Tavares and Dolly Suehead were not only banished from tribal lands but also barred from running in the December 2011 election for Tribal Council, for which both had filed declarations of candidacy. Furthermore, all petitioners and others who were banished with them could not even vote in that election because they were barred from entering tribal lands to cast their ballots, and the time prescribed by the EC within which to request absentee ballots had already passed. The 2011 Tribal Council also punished petitioners Dolly Suehead, Barbara Suehead and Donna Caesar by ordering forfeiture of all of their entitlements to per capita payments for six months, while petitioner Tavares lost her per capita distributions for four years.

21. The 2011 Tribal Council's "Findings and Conclusions" against petitioners are not legally supportable, as petitioners' allegations were true. Indeed, the Tribal Council's findings and conclusions confirmed the truth of the allegedly defamatory statements. For example:

a. The Tribal Council did not deny that $25 million was paid to the Tribe's attorney, Dickstein, as claimed by petitioners, but only asserted that the money also went to two other attorneys at his firm. (In fact, petitioners are informed and believe, and on that basis allege, that Dickstein kept the lion's share of the $25 million for himself and paid only a small portion of it to other lawyers).

b. The Tribal Council did not deny that the $25 million in legal fees paid to Dickstein's firm were improperly based on a percentage of casino revenues distributed to the Tribe pursuant to the Indian Gaming Regulatory Act, as claimed by petitioners, but only asserted that the payments were made on the "tribal side" after "management fees" and repayment of "construction loans" were made.

**Petitioners Exhaust Their Tribal Remedies**

22. Beyond appealing their punishment to the very body that imposed it, petitioners had only one appellate option, which related solely to denial of their per capita distributions and did not provide review of their banishment sentences. Specifically, petitioners timely filed a joint appeal pursuant to section 5 of the Tribe's Amended Plan for the Allocation of Gaming Revenue (the "Revenue Allocation Plan"). The Revenue Allocation Plan provides that "any tribal member aggrieved in any way in connection with his or her claim of entitlement to receive per capita payments . . . may present an appeal in writing to the Appeals Board, which shall consist of three members appointed by the Tribal Council" – that is, the same Tribal Council that had ordered that petitioners be punished.

23. Thereafter, the same Tribal Council that was the subject of petitioners' recall petition, and had punished them for speech made in connection with that petition, appointed a three-person Appeals Board to hear petitioners' appeal, set for hearing on May 3, 2012. Petitioners appeared before that Board with their counsel to demonstrate that (a) they could not, and did not, defame the Tribe; (b) the tribal defamation ordinance under which the Tribal Council purported to punish petitioners violates the Indian Civil Rights Act of 1968 (the "ICRA"), the Tribe's constitution and its federally-approved Revenue Allocation Plan, all of which guarantee petitioners' right to freedom of speech; and (c) the punishment imposed upon petitioners for exercising their free speech rights also violates the ICRA and the Tribe's constitution, which itself recognizes the individual rights conferred by the ICRA and guarantees all tribal members due process and equal protection.

24. In May 2012, the Appeals Board denied the requested relief, and upheld the findings of the Tribal Council that had appointed the Board. The Appeals Board was the last avenue of redress available to petitioners through a tribal forum. Therefore, petitioners have fully exhausted all tribal remedies available to them.

**Petitioners Discover the Secret "Slush Fund" in Late 2012**

25. The 2011 Tribal Council acted contrary to the interests of the Tribe and outside the course and scope of their authority as tribal officers, not only by punishing petitioners

for their exercise of protected rights, but also by converting and misappropriating millions of dollars in tribal revenues through the secret slush fund established for the personal benefit of themselves and Dickstein.

26. Specifically, petitioners are informed and believe, and on that basis allege, that members of the 2011 Tribal Council established an account for tribal officeholders, certain employees and Dickstein, immediately funding that account with $7 million in tribal assets and authorizing an additional contribution of up to $8 million in tribal monies. Petitioners are informed and believe, and on that basis allege, that this account was established at a San Francisco branch of U.S. Bank in 2010. On the basis of information and belief, petitioners allege that the agreement establishing the account was amended to inure exclusively to the benefit of certain named individuals, including the members of the 2011 Tribal Council who were the subjects of petitioners' Recall Petition (specifically, Gene Whitehouse, Calvin Moman, Brenda Adams, David Keyser and Kim DuBach), as well as Dickstein, whom petitioners had criticized and sought to terminate as the Tribe's outside legal counsel. The agreement establishing the slush fund cannot be revoked before January 1, 2015 without the consent of the 2011 Tribal Council members and Dickstein. A true and correct copy of the "Escrow Agreement" and the "First Addendum to Escrow Agreement," establishing the slush fund and identifying members of the 2011 Tribal Council and Dickstein as beneficiaries, is attached as Exhibit A.

27. In effect, third parties who hold no membership or office in the Tribe are empowered to direct payments to themselves for a variety of self-serving reasons from a tribally-funded account with virtually no advance notice to the Tribe. Based on information and belief, petitioners allege that the agreement establishing the slush fund account purports to empower the members of the 2011 Tribal Council (two of whom are no longer elected tribal officials) and Dickstein to withdraw tribal funds for improper purposes to the detriment of the Tribe. For example, if the Tribe sues Dickstein for actions he took against the Tribe's interests, he will be entitled to demand payment of defense costs and indemnity from the tribal monies in the slush fund. Similarly, if the members of the 2011 Tribal Council themselves ever face

/ / /

banishment, disenrollment or loss of per capita distributions, they too will be entitled to demand payment from the slush fund.

**COUNT I**
**INDIAN CIVIL RIGHTS ACT – UNLAWFUL BANISHMENT**

28. Petitioners allege and incorporate as if fully set forth herein all the allegations in paragraphs 1 through 27 of this petition and complaint.

29. This Court has the power to review and reverse the swift and sudden banishment of petitioners from all tribal lands and activities because such banishment is a punitive sanction of such a severe and serious nature that it mandates habeas review under the Indian Civil Rights Act of 1968 (“ICRA”), 25 U.S.C. § 1303.

30. The members of the 2011 Tribal Council imposed these punitive sanctions in response to petitioners’ efforts to remove them from office and petitioners’ statements made in connection with the Recall Petition. In doing so, the Tribal Council violated 25 U.S.C. §§ 1302(a)(1) and 1302(a)(8) by improperly and illegally depriving petitioners of their liberty and property without due process of law, and by retaliating against petitioners for exercising their rights to engage in core political speech. These actions were taken by the same 2011 Tribal Council members whom petitioners sought to recall, in an effort to maintain complete control of tribal operations and assets at all costs. Those Tribal Council members sought to control tribal assets so they could continue and conceal their unlawful actions, including concealing the slush fund created for their own personal use and benefit.

31. The order banishing petitioners was unlawful and punitive, and imposed without affording petitioners their rights to procedural due process. The illegal sentence of banishment forbids petitioners from entering their own tribal lands, and excludes them from all tribal activities (such as running for election and eligibility to serve on tribal committees).

32. Such punishment amounts to a severe restraint on petitioners’ liberty, and each is entitled to issuance of a writ of habeas corpus under the ICRA.

33. Petitioners were not only illegally banished for exercising their protected right to free speech under ICRA, but were also denied their fundamental rights to due process

with respect to the banishment proceedings. Swift disciplinary action was taken against petitioners for their exercise of free speech rights without forewarning or prior notice. Their sole and exclusive tribal remedy for the sanction of banishment was to seek relief from the same Tribal Council members who had imposed it in the first place, and who were the subject of the Recall Petition that led to the banishment orders. Petitioners were not allowed to know any of the rules governing the proceedings before the Tribal Council. They were denied their opportunity to be meaningfully heard through the presentation of witnesses and evidence, or the confrontation of witnesses against them, in violation of their right to due process as guaranteed by the ICRA.

34. The 2011 Tribal Council's actions in singling out and banishing petitioners for exercising their free speech rights were arbitrary and illegal and violated petitioners' rights to equal protection of the laws as guaranteed by the ICRA.

35. The orders banishing petitioners further denied them equal protection under the law by denying petitioners' right to vote and/or right to run for elected tribal office, further foreclosing their ability to contest the criminal allegations against them.

36. The orders banishing petitioners, and in particular the extreme ten-year banishment of petitioner Jessica Tavares, amounts to a severe restraint on liberty and criminal sanction imposed in violation of the ICRA. Accordingly, a writ of habeas corpus is properly issued, and the orders banishing petitioners are properly set aside and vacated.

**COUNT II**
**INDIAN CIVIL RIGHTS ACT – UNLAWFUL DENIAL OF A FAIR TRIAL**

37. Petitioners allege and incorporate as if fully set forth herein all the allegations in paragraphs 1 through 27 of this petition and complaint.

38. Section 1302(a)(6) of the Indian Civil Rights Act provides that no "tribe exercising powers of self-government shall . . . deny to any person in a criminal proceeding the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him [and] to have a compulsory process for obtaining witnesses in his favor . . . ." Petitioners were denied each of these rights.

/ / /

39. The penalty imposed upon petitioners for the exercise of their core right to engage in free political speech was not a modest fine or short suspension of a privilege. Instead, the severe sanction of banishment, which was imposed upon petitioner Tavares for a decade, constitutes a serious detention and restriction of petitioners' liberty amounting to a penalty that is criminal in nature. So too was the forfeiture of petitioners' per capita distributions, amounting to hundreds of thousands of dollars in lost income to petitioners. In the case of petitioner Tavares, the severe and devastating per capita distribution penalty was imposed for four years and has already resulted in the foreclosure and loss of her home.

40. Petitioners were denied the right to a public trial for their alleged transgressions against the Tribe. They were afforded only a closed meeting with respect to the banishment and denial of per capita distributions. They had no further tribal remedy as to the banishment orders, and could only appeal the per capita distribution penalty before an Appeals Board appointed by the same Tribal Council members who had imposed that severe penalty. Petitioners were not allowed to call witnesses or confront any witnesses who had accused them, thereby denying them their rights to a fair trial in violation of the ICRA.

41. The orders banishing petitioners, and in particular the extreme ten-year banishment of petitioner Jessica Tavares, amount to a severe restraint on liberty and criminal sanction imposed in violation of petitioners' rights to a fair trial under the ICRA. Accordingly, a writ of habeas corpus is properly issued, and the order banishing petitioners is properly set aside and vacated.

**COUNT III**
**INDIAN CIVIL RIGHTS ACT – UNLAWFUL DENIAL OF BENEFITS**

42. Petitioners allege and incorporate as if fully set forth herein all the allegations in paragraphs 1 through 27 of this petition and complaint.

43. After the November 22, 2011, closed meeting before the 2011 Tribal Council, and following the 2011 Tribal Council's decision to uphold all charges a week later, petitioners were allowed to appeal only one component of the punishment imposed upon them. Specifically, they were provided the right to appeal the forfeiture of their entitlement to per capita

payments pursuant to the Revenue Allocation Plan – a plan required and approved by the federal government, and under which revenue from the Tribe's Thunder Valley Casino is distributed to tribal members.

44. Petitioners availed themselves of the right to further appeal the loss of their per capita payments to the Tribe's Appeals Board. That Board was appointed by the Tribal Council, and included one of the Tribal Council members who had denied petitioners' previous appeal on November 29, 2011. In May 2012, the Appeals Board summarily denied all relief requested by petitioners and upheld all findings previously made by the Tribal Council, but reduced the forfeiture of petitioner Tavares' per capita entitlements by six months and the other petitioners' forfeiture of per capita entitlements by one month.

45. The foreordained decision by the Tribe's Appeals Board was the last avenue of redress available to petitioners with respect to the withholding of their per capita payments. Therefore petitioners have exhausted all tribal remedies available to them.

46. The imposition of individual fines exceeding millions of dollars through the withholding of petitioners' per capita entitlements violates their guaranteed right to freedom of speech. That right, embodied in 25 U.S.C. § 1302(a)(1), prohibits tribal governments from "mak[ing] or enforc[ing] any law . . . abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances."

47. The tribal ordinance under which petitioners were convicted and punished, which echoes the language of the Alien and Sedition Acts of 1798 (1 Stat. 596), provides that "[a]ll tribal members shall have a duty to refrain from defaming the reputation of the Tribe, its officials, its employees or agents outside of a tribal forum, and where this duty is breached, shall reimburse the Tribe for any resulting costs incurred or losses." This tribal ordinance violates the ICRA and the Tribe's federally-approved Revenue Allocation Plan, entitling petitioners to a declaration confirming that the forfeiture of their per capita payments, coupled with the banishment from tribal lands, violates federal law.

48. The orders imposing crippling monetary sanctions on petitioners, coupled with their banishment from tribal lands and deprivation of tribal rights, amount to a severe

restraint on liberty and criminal sanctions imposed in violation of the ICRA. Accordingly, a writ of habeas corpus is properly issued.

## PRAYER FOR RELIEF

WHEREFORE, petitioners respectfully request that the Court grant the following relief:

A. Issue the requested writ of habeas corpus or, to the extent necessary, order respondents to show cause immediately why the writ should not issue and to answer the allegations contained herein;

B. To the extent necessary, permit petitioners to conduct discovery and submit written briefs in advance of any evidentiary hearing concerning this petition;

C. Declare that respondents' banishment orders and withholding of per capita entitlements represent a sufficiently severe potential or actual restraint on petitioners' liberty as to warrant habeas review;

D. Order respondents to discharge petitioners from the detention and restraints on their personal liberty;

E. Issue an order vacating petitioners' convictions for acts constituting seditious libel; and

F. Grant such other and further relief as the Court may deem proper.

Dated: October 10, 2013

MENNEMEIER, GLASSMAN & STROUD LLP
ANDREW W. STROUD
KELCIE M. GOSLING

/s/ Andrew W. Stroud
Andrew W. Stroud
Attorneys for Petitioners
Jessica Tavares, Dolly Suehead, Donna Caesar and Barbara Suehead

# EXHIBIT A

## ESCROW AGREEMENT

This Escrow Agreement ("Agreement") is made and entered into effective this 7th day of September, 2010, the date of actual signature by the parties notwithstanding, by and between the United Auburn Indian Community, a federally recognized Indian tribe ("Tribe" or "UAIC") and U.S. Bank National Association, a national banking association ("Agent"). Collectively, the Tribe and Agent are hereinafter referred to as the "Parties".

### Preliminary Statements

The following preliminary statements are hereby incorporated into and made a part of this Agreement:

The United Auburn Indian Community is a federally recognized Indian Tribe. The Tribe is governed pursuant to a Constitution, which has been approved by the Secretary of the Interior. Article IV of the Constitution, provides that the Tribal Council is the governing body of the Tribe.

The Tribal Council recognizes that it is in the Tribe's best interest if its members become actively involved in Tribal affairs by running for and serving as Tribal Council Members. Similarly, it is vital to the interests of the Tribe to attract and retain qualified personnel to serve in official capacities, key employment; and attorney, consultant and advisory positions with the Tribe.

The Tribal Council recognizes that competent and experienced Tribal members, employees; and attorneys, consultants and advisors may be or may become increasingly reluctant to serve or to continue to serve unless they are protected by comprehensive liability insurance or indemnification, or both, due to threats of litigation, termination, disenrollment, withdrawal of distribution payments, lawsuits and exposure to arbitration and litigation costs resulting from their service to the Tribe.

The Tribal Council recognizes that to attract and retain qualified elected officials, employees, and attorneys and consultants and advisors serving the Tribe it is reasonable, appropriate and in the best interests of the Tribe to provide Tribal Council Members , key employees and designated attorneys, consultants and advisors, with severance benefits upon the conclusion of their service to the Tribe.

In furtherance of the objectives set forth above, the Tribal Council has adopted an ordinance entitled First Amended Indemnification and Service Honorarium Ordinance for Tribal Council Members of the United Auburn Indian Community ("Amended Ordinance"). By separate contract, some of the benefits of the Amended Ordinance have been extended to certain key employees and attorneys of the Tribe. Portions of the Amended Ordinance provide for the establishment of an escrow account to fund various financial obligations of the Tribe set forth in the Amended Ordinance and by contract that are in furtherance of the objectives set forth above.

The purpose of this Agreement is to establish that escrow account and to set forth the ~~conditions under which payments from it shall be made to indemnities identified in the Amended~~ Ordinance.

Now therefore, in consideration of the promises and undertakings hereinafter set forth, the adequacy and sufficiency of which as legal and binding consideration is acknowledged by the Parties, and intending to be bound hereby, the Tribe and Agent agree as follows:

1. **Definitions**. The capitalized terms herein shall have the meaning set forth in the body of this Agreement.

2. **Establishment of Escrow Account**. The Tribe hereby establishes Escrow Account No. _ ______ ("Account") with Agent to be maintained and administered pursuant to this Agreement.

(A) **Deposit of Escrow Funds**. The Tribe shall deposit $7,000,000.00 ("Initial Escrow Amount") via wire transfer of immediately available funds into the Escrow Account no later than 10 days following execution of the Escrow Agreement by the Agent and delivery thereof to the Tribe. If the Tribe fails to make the deposit of the Initial Escrow Amount, the Agent shall have no obligation to comply with these instructions. From time to time, the Tribe may deposit additional funds into the Account in such amounts as it deems necessary to fulfill its indemnification and severance payment obligations under the Amended Ordinance ("Additional Funds"). The funds in the Account shall be disbursed by the Agent solely in compliance with the instructions and provisions of this Agreement. (The Initial Escrow Amount and Additional Funds collectively shall hereinafter be referred to as the "Escrow Amount.")

(B) **Investment of Escrow Account**. The Escrow Amount shall be invested in the Agent's Money Market Deposit Account as described in Exhibit C attached hereto. In no instance shall the Agent have any liability for the performance of any such investment (including, without limitation, any loss incurred on any investment liquidated prior to maturity when necessary to make a payment under this Agreement), and the Agent shall be under no obligation to give investment advice.

(C) **Uninvested Funds**. Monies credited to any account or fund maintained hereunder which are uninvested pending disbursement or receipt of proper investment directions or as directed herein, may be deposited to and held in a non-interest bearing demand deposit account established with the Agent or with any bank affiliated with the Agent without the pledge of securities or other collateralization of such deposit accounts

(D) **Authorization to Invest**. The Parties acknowledge and agree that the Agent is authorized to invest from or through its trust department or U.S. Bank National Association or any other bank affiliated with Agent through common control by U.S. Bancorp.

3. **Submission and Payment of Claims**. From time to time Tribal Council Members of the Tribe in office at the time of adoption of the Amended Ordinance and elected thereafter, and others entitled to the benefits and protections afforded by the Amended Ordinance pursuant to contract, (collectively "Beneficiaries") may file requests directly with the Agent for payment of money due pursuant to the terms of the Amended Ordinance or their individual contracts

("Claims"). All Claims sh be made in writing addressed and deli ed to the Agent at the following address: U.S. Bank National Association One California Street, Suite 1000, San Francisco, CA 94111 attn.: Andrew Fung, Corporate Trust Services. All claims must be made on a form in both form and substance as shown in Exhibit A, attached hereto and made a part hereof ("Payment Request"). Agent shall have no responsibility for verifying the accuracy of any information contained in a Claim or Payment Request.

(A) **Notice to Tribe; Payment of Claim**. Upon receipt of a Claim in a Payment Request, Agent shall give notice as follows: "Within five (5) business days of receipt of a Payment Request, Agent shall pay such request with funds from the Escrow Account provided that: (i) all blanks in the Payment request are completed; (ii) the form is notarized; and (iii) there are sufficient funds in the Account to pay the Claim. Within two (2) business days thereafter, Agent shall notify the Tribe in writing of such payment and provide the Tribe with a legible copy of each Payment Request that was paid. Agent shall pay all Claims submitted in accordance with these instructions regardless of any dispute: (i) arising under the terms and provisions of this Agreement; (ii) arising from or related to the Amended ordinance; or (iii) arising from or related to any Claim."

4. **Agent's Duties.** Agent's duties and responsibilities shall be limited to those expressly set forth in this Agreement; and Agent shall not be subject to, or obliged to recognize, any other agreement between the Parties or any other persons even though reference thereto may be made herein; provided, however, this Agreement may be amended at any time or times by an instrument in writing signed by all the Parties hereto, approved by the Tribe by written resolution duly adopted by its Tribal Council and with the written consent of all Beneficiaries. Agent shall not be subject to or obligated to recognize any notice, direction or instruction of the Tribe or any other person except as expressly provided for and authorized in this Agreement. Agent shall not be liable to the Tribe or to any other entity or individual for consequential damages, (including, without limitation lost profits) losses, or expenses, except for gross negligence or willful misconduct on the part of the Agent.

(A) **Agent's Actions and Reliance.** Agent shall not be personally liable for any act taken or omitted by it hereunder if taken or omitted by it in good faith and in the exercise of its own best judgment. Agent shall also be fully protected in relying upon any written notice, instruction, direction, certificate or document which in good faith it believes to be genuine.

(B) **Collections.** Agent shall not be required or have a duty to notify anyone of any payment or maturity under the terms of any instrument, security or obligation deposited in the Account, nor to take any legal action to enforce payment of any check, instrument or other security deposited in the Account. The Account is a safekeeping escrow account, and no interest shall be paid by Agent on any money deposited or held therein, except as provided in this Agreement.

(C) **Validity of Documents.** Agent shall not be responsible or liable for the sufficiency or accuracy of the form, execution, validity or genuineness of documents, instruments or securities now or hereafter deposited in the Account, or of any endorsement thereon, or for any lack of endorsement thereon, or for any description therein. Agent shall not be responsible or liable in any respect on account of the identity, authority or rights of the

persons executing or deliv[illegible] ig or purporting to execute or deliver [illegible] such document, security or endorsement or this Agreement.

---

(D) **Notices/Directions to Agent.** Notices, Payment Request, Claims and directions to Agent from the Tribe, or from other persons authorized to give such notices or directions shall be in writing and signed by an authorized representative as identified pursuant to this Agreement, and shall not be deemed to be given until actually received by Agent's employee or officer who administers the Account. Agent shall not be responsible or liable for the authenticity or accuracy of notices or directions properly given hereunder if the written form and execution thereof on its face purports to satisfy the requirements applicable thereto as set forth in this Agreement, as determined by Agent in good faith without additional confirmation or investigation.

(E) **Books and Records.** Agent shall maintain books and records regarding its administration of the Account, and the deposit, investment, collections and disbursement or transfer of Assets, shall retain copies of all written notices and directions sent or received by it in the performance of its duties hereunder, and shall afford the Tribe reasonable access, during regular business hours, to review and make photocopies (at the Tribe's cost) of the same.

(F) **Notice by Agent.** Any notices, except notice of a Claim in a Payment Request, which Agent is required or desires to give hereunder to the Tribe shall be in writing and may be given by mailing the same to the address indicated below for such Party (or to such other address as said Party may have theretofore substituted therefor by written notification to Agent), by United States certified or registered mail, postage prepaid. For all purposes hereof any notice so mailed shall be as effectual as though served on the Tribe at the time it is deposited in the United States mail by Agent whether or not such undersigned thereafter actually receives such notice. Whenever under the terms hereof the time for Agent's giving a notice or performing an act falls upon a Saturday, Sunday, or holiday, such time shall be extended to the next business day.

(G) **Legal Counsel.** If Agent believes it to be reasonably necessary to consult with legal counsel concerning any of its duties in connection with the Account or this Agreement, or in case Agent becomes involved in litigation on account of being agent hereunder or on account of having received property subject hereto, then in either case, its costs, expenses, and reasonable attorney's fees shall be paid by the Tribe.

5. **Controversies and Disputes.** If any controversy arises between the Parties to this Agreement or with any other persons or entities, including but not limited to Beneficiaries concerning the subject matter of this Agreement, its terms or conditions, or entitlements to payment from the Agent, Agent will not be required to determine the controversy or to take any action regarding it. During the pendency of any controversy, and until ordered by a court to the contrary, Agent shall continue to fulfill its duties and to pay all Claims in accordance with the terms of this Agreement. In such event, Agent will not be liable for interest or damage.

(A) **Court Orders**. Agent shall comply with orders issued or process entered by any court with respect to the Account, the Escrow Amount or this Agreement, without determination by the Agent of such court's jurisdiction in matter. If any Escrow Amount is at any time attached, garnished, or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting

such property or any part thereof, then in any such events Agent is authorized to and shall rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel of its own choosing is binding upon it; and if Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the Parties or to any other person, firm, entity or corporation by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

6. **Agent Compensation.** Agent shall be paid a fee for its services as set forth in Exhibit B attached hereto and made a part hereof, which shall be subject to increase upon notice sent to the Tribe, and reimbursed for its reasonable costs and expenses incurred.

(A) **Non Payment of Fees**. If Agent's fees, or reasonable costs or expenses provided for herein are not paid within 30 days of receipt by the Tribe of the Agent's invoice, Agent shall have the right to liquidate such portion of the Escrow Amount as necessary to pay itself for any unpaid fees or reasonable costs or expenses.

(B) **Additional Services and Hold harmless**. In the event that the conditions of this Agreement are not promptly fulfilled, or if Agent renders any service not provided for in this Agreement, or if the Parties request a substantial modification of its terms, or if any controversy arises, or if Agent is made a party to, or intervenes in, any litigation pertaining to this escrow or its subject matter, Agent shall be reasonably compensated for such extraordinary services and reimbursed for all costs, attorney's fees, including allocated costs of in-house counsel, and expenses occasioned by such default, delay, controversy or litigation and Agent shall have the right to retain all documents and/or other things of value at any time held by Agent in this escrow until such compensation, fees, costs, and expenses are paid. The Tribe and its respective successors and assigns agree jointly and severally to indemnify and hold Agent harmless against any and all losses, claims, damages, liabilities, and expenses, including reasonable costs of investigation, counsel fees, including allocated costs of in-house counsel and disbursements that may be imposed on Agent or incurred by Agent in connection with the performance of his/her duties under this Agreement, including but not limited to any litigation arising from this Agreement or involving its subject matter. Agent shall have a first lien on the property and papers held under this Agreement for such compensation and expenses.

7. **Termination of Escrow**.

(A) **Termination by Tribe**. Escrow may be terminated by the Tribe only upon receipt by Agent of a duly adopted resolution of the Tribal Council containing the information hereinafter set forth ("Resolution"), and the written consent of all Beneficiaries. The Resolution shall: (i) authorize termination of escrow; (ii) set forth the names of all Beneficiaries existing at the time of adoption of said Resolution; and (iii) specify the date on which the Agent shall release any funds remaining in the Escrow Account to the Tribe ("Release Date"). If one or more Claims are pending as of the Release Date, the Escrow Amount shall remain in the Escrow Account until payment of all such Claims whereupon the Escrow Amount will be disbursed by the Agent in accordance with this Agreement on or as close to the Release date as reasonably possible.

(B) **Identification of Beneficiaries**. The Resolution of the Tribal Council approving this Agreement and granting a limited waiver of sovereign immunity as hereinafter provided,

also shall contain the nam :f the then current Beneficiaries. The 1 e may, from time to time, by Resolution duly adopted by the Tribal Council and delivered to Agent, designate additional ~~Beneficiaries entitled to make Claims pursuant to this Agreement. After receipt of such notice,~~ Agent shall treat those additional Beneficiaries in the same manner as the Beneficiaries identified in the Tribal Council Resolution approving this Agreement.

(C) **Agent Resignation.** Agent reserves the right to resign at any time by giving written notice of its resignation, specifying the effective date thereof, to the Tribe. Within 30 days after receiving the aforesaid notice, the Tribe shall appoint a successor escrow agent to which Agent shall transfer the Escrow Amount then held in the Account, less its unpaid fees, costs and expenses. If a successor escrow agent has not been appointed and has not accepted such appointment by the end of the 30-day period, Agent may apply to a court of competent jurisdiction for the appointment of a successor escrow agent, and the costs, expenses and reasonable attorney's fees which Agent incurs in connection with such a proceeding shall be paid by the Tribe.

8. **Miscellaneous.**

(A) **Governing Law.** This Agreement shall be construed, enforced, and administered in accordance with the laws of the State of California.

(B) **Automatic Succession.** Any company into which the Agent may be merged or with which it may be consolidated, or any company to whom Agent may transfer a substantial amount of its Escrow business, shall be the Successor to the Agent without the execution or filing of any paper or any further act on the part of any of the Parties, anything herein to the contrary notwithstanding.

(C) **Tax Reporting.** The Agent shall have no responsibility for the tax consequences of this Escrow Agreement. The Agent hereby advises each party to this escrow to consult with independent legal counsel concerning the tax ramifications of this transaction.

(D) **Facsimile.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

(E) **Patriot Act.** To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a Trust or other legal entity we will ask for documentation to verify its fomation and existence as a legal entity. We may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

(F) **Security Advice Waiver Language.** The Tribe hereto acknowledges that, in accordance with regulations of the Comptroller of the Currency, it has the right to receive

brokerage confirmations security transactions as they occur. The Tribe hereto specifically waives such notification to the extent permitted by law and acknowledges that the Tribe will ~~receive periodic cash transaction statements, which will detail all investment transactions.~~

9. **Dispute Resolution**. Any disagreements or disputes arising between the Parties relative to their rights and obligations under this Agreement shall be resolved in accordance with the procedures hereinafter set forth, which shall provide the sole mechanism for dispute resolution. The parties explicitly agree that such procedures shall be the exclusive remedy for the parties.

A. **Meet and Confer**. Any party to this Agreement who asserts it has a claim, disagreement or grievance ("Dispute") against the other party arising out of or related to this Agreement shall first notify the other party in writing of such and request a meeting with the other party. No later than seven (7) business days (Monday through Friday) after receipt by the other party of such notice, the parties shall meet and confer for a minimum of two (2) hours. This meeting shall be for the express purposes of (1) exchanging and reviewing all pertinent non-privileged documents and information relating to the matters and issues in dispute, (2) freely and candidly discussing each party's position, and (3) reaching agreement upon a reasonable, compromise resolution of the Dispute.

B. **Arbitration**. If the Dispute cannot be resolved to the satisfaction of both parties by meeting and conferring, either party may seek a resolution by binding arbitration in accordance with the then prevailing rules of the American Arbitration Association ("Association")(or any successor thereto to the extent not inconsistent herewith), upon written notice to the other party of its intention to do so. The Parties agree that in any such arbitration each party shall be entitled to discovery as provided by the California Rules of Civil Procedure except as limited by the arbitrator. The Parties will select an arbitrator in accordance with the rules of the Association. If the Parties fail to select or agree upon the selection of an arbitrator within ten (10) days after being requested in writing by the Association to do so, the Association shall appoint an arbitrator to resolve the Dispute. All hearings shall be conducted in Sacramento, California within thirty (30) days after the arbitrator is selected, unless the time period is extended by the arbitrator to allow the parties to complete discovery. The hearings shall be conducted in the arbitrator's presence. The decision of the arbitrator will be binding on the Parties and non-appealable. The costs and expenses of the arbitration shall be advanced by the parties (in equal shares) if and when required by the Association. In rendering its decision and award, if any, the arbitrator shall not add to, subtract from, or otherwise modify the provisions of this Agreement.

C. **Judicial Enforcement**. Either party may seek judicial enforcement of an arbitration decision in accordance with the provisions of Paragraph B, above. The appropriate Court shall have the authority not only to confirm any order or decision of the arbitrator, but to issue all orders and judgments necessary, including, but not limited to, the issuance of temporary or permanent injunctions to prohibit the Parties from engaging in conduct that violates the provisions of this Agreement; compelling the Parties to comply with the provisions of this Agreement; and/or requiring the Parties to pay over any moneys found to be due and owning under this Agreement as a result of arbitration hereunder.

10. **Limited Waiver of Sovereign Immunity**.

A. **Purpose o. . ,aiver.** The Tribe hereby waives its s . eign immunity only for the limited purposes of compelling binding arbitration in accordance with the provisions of ~~Section 9 of this Agreement, arbitrating Disputes and of permitting judicial enforcement of an~~ award in arbitration made pursuant to Section 9.

B. **Conditions of Waiver**. The Tribe grants the limited waiver of its sovereign immunity herein, if, and only if, each and every one of the following conditions is met: (i) any claim that is a part of a Dispute ("Underlying Claim") is brought by a party to this Agreement and not by any third party; (ii) each Underlying Claim alleges a material uncured breach by the Tribe of one or more of the specific obligations or duties expressly assumed by it under the terms of this Agreement; (iii) each Underlying Claim seeks some specific action, or discontinuance of some action by the Tribe to bring the Tribe into full compliance with the duties and obligations expressly assumed by it under this Agreement, or, seeks money damages (except special, punitive, or exemplary damages, which are not permitted against the Tribe) for a material, uncured breach of the terms of this Agreement; (iv) each Underlying Claim is first made in a detailed written statement to the Tribe, stating the specific action or discontinuance of action by the Tribe which would cure the alleged breach or non-performance, or the sum of money claimed to be due and owing from, and the Tribe shall have failed to cure such breach, non-performance or non-payment within thirty (30) calendar days (or such additional time as may be reasonably required given the nature of the breach) after its receipt of such statement; and (v) all of the procedures for dispute resolution in Section 9 have been followed.

C. **Satisfaction of Judgment**. A party may encumber or seek satisfaction of judgment arising from judicial enforcement of an award in binding arbitration only from revenues generated by or in connection with the Tribe's casino operations or from funds in the Account. No interest in land, whether tangible or intangible, legal or beneficial, vested or contingent, or any occupancy or other rights or entitlements therein or related thereto, and no Tribal distributions made or set aside to its Tribal members shall be subject to attachment, execution, lien, judgments or other enforcement or satisfaction of any kind, in whole or in part, with respect to any Underlying Claim, award of arbitration or judgment.

D. **No Waivers for Manager and Certain Persons**. This limited waiver shall not be construed as a waiver of any immunity, if any, of any elected or appointed officer, official; member; manager; employee or agent of the Tribe.

E. **Jurisdiction and Venue**. The parties each hereby consent to the jurisdiction of the United States District Court for the federal court district in which the Tribe has its principal place of business, the United States Court of Appeals for the Ninth Circuit, and for the United States Supreme Court; or, should the Federal Courts decline to take jurisdiction of the matter, in the County Superior Court in which the Tribe has its principal place of business, and/or the Appellate Court of the State of California.

F. **Attorneys Fees**. Each party in any arbitration or judicial proceeding undertaken in accordance with this Addendum shall be responsible for paying its respective attorneys fees, costs and disbursements.

G. **Resolution**. The Tribe shall provide Agent with a duly adopted resolution approving this Agreement, explicitly approving the limited waiver of sovereign immunity

contained in this Agreeme and setting forth the names of the Inde itees and others entitled to the protections and benefit of the Amended Ordinance. Such Amended Ordinance shall be in the form and substance shown in Exhibit D, attached hereto and made a part hereof.

End of Provisions

TRIBE

UNITED AUBURN INDIAN COMMUNITY

By: David Keyser
Its: Tribal Chairperson
Address of Tribe:
10720 Indian Hill Road, Auburn, CA 95603

AGENT

U.S. BANK NATIONAL ASSOCIATION

By:
Its:
Address:

contained in this Agreement and setting forth the names of the Indemnitees and others entitled to the protections and benefit of the Amended Ordinance. Such Amended Ordinance shall be in the form and substance shown in Exhibit D, attached hereto and made a part hereof.

End of Provisions

TRIBE

UNITED AUBURN INDIAN COMMUNITY

_________________________________________
By:
Its:
Address of Tribe:

AGENT

U.S. BANK NATIONAL ASSOCIATION

_________________________________________
By: ANDREW FUNG 9/20/2010
Its: Vice President
Address:

**EXHIBIT B**
**AGENT'S FEE SCHEDULE**

| | | |
|---|---|---|
| 01010 | **Acceptance Fee**<br>The acceptance fee includes the administrative review of documents, initial set-up of the account, and other reasonably required services up to and including the closing. This is a one-time fee, payable at closing. | $3,500.00 |
| 04460 | **Annual Administration Fee**<br>Annual Administration fee for performance of the routine duties of the escrow agent associated with the management of the escrow account. Administration fees would be payable in advance at closing, and annually thereafter. | $1,500.00 |

***Direct Out of Pocket Expenses***

Reimbursement of expenses associated with the performance of our duties, including but not limited to publications, legal counsel, travel expenses and filing fees (if applicable). — At Cost

***Extraordinary Services***

Extraordinary services are duties or responsibilities of an unusual nature, including termination, but not provided for in the governing documents or otherwise set forth in this schedule. A reasonable charge may be assessed based on the nature of the service and the responsibility involved. At our option, these charges would be billed at a flat fee or at our hourly rate then in effect.

**EXHIBIT C**
**U.S. BANK NATIONAL ASSOCIATION**
**MONEY MARKET ACCOUNTS**
**ACCOUNT DESCRIPTION TERMS**

The U.S. Bank money market accounts are U.S. Bank National Association ("U.S. Bank") deposit accounts designed to meet the needs of Global Escrow and other Corporate Trust customers of U.S. Bank National Association. The accounts pay competitive variable interest rates, which are determined, based upon the customer's aggregated balance. These accounts are insured by the Federal Deposit Insurance Corporation up to $100,000 per customer.

Interest rates currently offered on the accounts are determined at U.S. Bank's discretion and may change daily. U.S. Bank uses the daily balance method to calculate interest on these accounts (actual/365). This method applies a daily periodic rate to the principal in the accounts each day. The average daily balance is calculated by adding the principal in an account for each day of the month and dividing that figure by the number of days in the period. Interest is compounded on a monthly basis.

The owner of the accounts is U.S. Bank National Association as Agent for its trust customers. All account deposits and withdrawals are performed by U.S. Bank National Association's Trust Department. U.S. Bank National Association is an affiliate of U.S. Bank.

For further information, call your account representative at U.S. Bank National Association.

# FIRST AMENDMENT TO ESCROW AGREEMENT

This Agreement is made by and between the United Auburn Indian Community, a federally recognized Indian tribe ("Tribe" or "UAIC") and U.S. Bank National Association, a national banking association ("Agent"), [collectively the "Parties"] and constitutes an amendment ("Amendment") to the escrow agreement entered into by the parties on September 7, 2010 ("Escrow Agreement").

I. **Escrow Agreement**. The Parties expressly agree that except as otherwise provided herein the provisions of the Escrow Agreement remain in full force and effect.

II. **Amendment**. The Parties agree that Preliminary Statement and Sections 2(A), 3, 4(D) and (F), 5, 7(A) and 7(D), and 10 are amended as follows:

A. **Preliminary Statement**. The terms of Paragraph 5 of the Preliminary Statement is replaced with the following language:

In furtherance of the objectives set forth above, the Tribe has entered or will enter into agreements with Tribal Council Members Brenda Conway, Kim DuBach, David Keyser, Gene Whitehouse and Calvin Moman, employees Greg Baker and Amber Quezada, and attorney Howard Dickstein (collectively "Beneficiaries") to provide for indemnification and in some cases, severance, service honorarium, and/or liquidated expenses. As set forth in these agreements, due to the fact that the Tribe may be unable to obtain insurance to cover the obligations set forth in these agreements (collectively referred to as "Indemnity Agreements"), it has a contractual obligation to self insure these obligations and has agreed to do so through the creation of an escrow account. The purpose of this Agreement is to establish that escrow account and to set forth the conditions under which payments from the escrow account will be made to the Beneficiaries.

B. **Submission and Payment of Claims**. The terms of Section 3 Submission and Payment of Claims are replaced with the following language and a new Payment Request Form shall be used in lieu of the prior Payment Request form submitted to the Agent, which is attached hereto as Exhibit A:

**Section 3. Submission and Payment of Claims**. From time to time Beneficiaries may file requests directly with the Agent for payment of money due pursuant to the terms of the Indemnity Agreements ("Claims" or "Payment Requests"). All Claims shall be made in writing addressed and delivered to the Agent at the following Address: U.S. Bank National Association, One California Street, Suite 1000, San Francisco, CA 94111, Attn. Andrew Fung, Corporate Trust Services. All Payment Requests must be on a form in both form and substance as shown in Exhibit A, attached hereto and made a part hereof ("Payment Request"). The Agent shall have the authority to pay claims as follows:

(A) **Scope of Agent's Authority Upon Receipt of a Payment Request**: Upon receipt of a Payment Request from a Beneficiary, the Agent shall notify the Tribe of receipt of said

Payment Request in writing within three (3) days of receiving said request. Within five (5) days of receipt of the written notification from the Agent, the Tribe may submit to the Agent in writing any objection ("Objection") it has to the payment of any or all of the Payment Request ("Objection Period"). Said Objection must be received by the Agent within the Objection Period. The Tribe and Beneficiary must also promptly respond to any requests for clarification or information by the Agent with respect to said Payment Request or Objection. In the event the Agent receives no Objection from the Tribe within the Objection Period, the Agent shall pay Beneficiary the entire amount of the Payment Request within three (3) days of the expiration of the Objection Period. If the Tribe submits an Objection to the Agent within the Objection Period and objects to payment of all of the Expenses set forth in the Payment Request, within three (3) days of receipt of the Objection, the Agent shall forward to Beneficiary a copy of the Tribe's Objection. If the Tribe submits an Objection within the Objection Period and only objects to a portion of the Employee's Payment Request, within three (3) days of receipt of the Objection, the Agent shall (1) forward to the Beneficiary a copy of said Objection and (2) forward payment to the Beneficiary for any portion of the Payment Request to which the Tribe did not object.

**(B) <u>Authority to Pay Amounts pursuant to Mediated Agreement or Order of Arbitrator</u>**: If and when an Objection is made to a part or all of a Payment Request, the Beneficiary who submitted the Payment Request can seek mediation or arbitration of the Beneficiary's right to said payment under the terms of the Indemnification Agreements. Upon presentation of (1) an agreement signed by the Tribe and the Beneficiary that payments are to be made to the Beneficiary; or (2) upon presentation of a decision or award by an arbitrator who hears a dispute between the Tribe and a Beneficiary, the Agent shall pay the amount specified in the mediated agreement or decision or award to the Beneficiary within five (5) days of receipt of said agreement, decision or award.

**(C) <u>Authority to Pay Arbitrator or JAMS</u>**: When presented with a mediated agreement signed by the Tribe and a Beneficiary which specifies for the payment of fees or expenses of a mediator or arbitrator or JAMS or an decision or aware of an arbitrator providing for the payment of fees or expenses of a mediator or arbitrator or JAMS, the Agent shall make payment to the identified mediator, arbitrator or JAMS.

**C. <u>Agent's Duties</u>**. The terms of Sections 4(D) and (F) Notice/Directions to Agent; Notice by Agent are replaced with the following language:

**<u>Notice</u>**. Insofar as any term of this Agreement calls for notice or payment, said notice or payment shall be provided as follows:

<u>To the Tribe</u>: By sending the notice or payment to the United Auburn Indian Community, Attn. Tribal Administrator, 10720 Indian Hill Road, Auburn, CA 95603 by hand-delivery (and signed for by an agent of the Tribe), overnight delivery or registered mail. When hand-delivered, the notice will be deemed received when signed for by an agent of the Tribe; when sent by overnight delivery, said notice will be deemed received two (2) days following the delivery of the notice to the overnight carrier; when sent by registered mail, the notice will be deemed received three (3) days after the date the registered mail was placed in the mail if mailed within California, if mailed outside of California, four (4) days after the registered mail was

placed in the mail.

To the Agent: By sending the notice to the U.S. Bank National Association, Attn. Andrew Fung, Corporate Trust Services, One California Street, Suite 1000, San Francisco, CA 94111, by hand-delivery (and signed for by Andrew Fung) by overnight delivery or registered mail. When delivered by hand, said notice will be deemed received when signed for by an agent of the Agent; when sent by overnight delivery, said notice will be deemed received two (2) days following the delivery of the notice to the overnight carrier; when sent by registered mail, the notice will be deemed received on three (3) days after the date the registered mail was placed in the mail if mailed within California, if mailed outside of California, four (4) days after the registered mail was placed in the mail.

To Beneficiary: By sending the notice or payment to the Beneficiary, by hand-delivery (and signed for by Beneficiary), overnight delivery or registered mail. When delivered by hand, said notice will be deemed received when signed for by Employee; when sent by overnight delivery, said notice will be deemed received two (2) days following the delivery of the notice to the overnight carrier; when sent by registered mail, said notice will be deemed received three (3) days after the date the registered mail was placed in the mail if mailed within California, if mailed outside of California, four (4) days after the registered mail was placed in the mail.

The addresses for the individual Beneficiaries to receive such notice will be provided to the Agent within ten (10) days of the execution of this Amendment. Any change to those addresses must come from the individual Beneficiary to the Agent in writing.

The Parties shall provide notice to the other in writing if and when the address for that party to receive such notice or payment changes and the Agent shall provide notice to the Beneficiaries if and when the address for the Agent to receive notice changes.

Whenever under the terms hereof the time for Agent, Beneficiary or Tribe giving a notice or performing an act falls upon a Saturday, Sunday or federal legal holiday, such time shall be extended to the next business day.

**D. Controversies and Disputes**. The Parties agree that Section 5(B) Mediated Agreements and Arbitration Decisions and Awards is added to Section 5 Controversies and Disputes as follows:

**Section 5(B) Mediated Agreements and Arbitration Decisions and Awards**. Agent shall comply with (1) the terms of a mediated agreement between the Tribe and a Beneficiary; (2) and order or decision of an arbitrator in an arbitration between the Tribe and a Beneficiary, without determination by the Agent of such arbitrator's jurisdiction in matter.

**E. Termination of Escrow**. The Parties agree that Section 7(B) Identification of Beneficiaries is stricken from the Escrow Agreement and the terms of Section 7(a) Termination by Tribe are replaced with the following language:

7. **Termination of Escrow**.

(A) **Termination by Tribe**.

1. Escrow may be terminated by the Tribe after January 1, 2015, upon receipt by agent of a duly adopted resolution of the Tribal Council ("Resolution") containing the information hereinafter set forth. The Resolution shall: (i) authorize termination of the Escrow; and (ii) specify the date upon which the Agent shall release any funds remaining in the Escrow Account to the Tribe ("Release Date"). If one or more Claims are pending as of the Release Date, the amount of said Claim shall remain in the Escrow Account until payment of all such Claims whereupon the Escrow Account will be dispersed by the Agent to the Tribe in accordance with the Resolution on or as close to the Release Date as reasonably possible.

2. Escrow may be terminated by the Tribe prior to January 1, 2015, forty-five (45) days after receipt by Agent of (a) a duly adopted resolution of the Tribal Council Resolution containing the information hereinafter set forth. The Resolution shall: (i) authorize termination of the Escrow; (ii) identify the names and addresses of all Beneficiaries; and (iii) specify a Release Date at least forty-five (45) days thereafter upon which the Agent shall release any funds remaining in the Escrow Account to the Tribe; and (b) a signed consent by all of the Beneficiaries that the Escrow may be terminated ("Consent"). Upon receipt of said Resolution and Consent, Agent shall provide the Beneficiaries with a copy of the Resolution and Consent. If one or more Claims are pending as of the Release Date, the amount of said Claim shall remain in the Escrow Account until payment of all such Clams whereupon the Escrow Account will be dispersed by the Agent to the Tribe in accordance with the Resolution on or as close to the Release Date as reasonably possible.

**Section 7(B) Identification of Beneficiaries** is stricken from the Escrow Agreement.

**F.** **Reference to Ordinance**. To the extent the Escrow Agreement refers to the term "Ordinance," or "Amended Ordinance," said reference is replaced by "Indemnification Agreements."

**G.** **Resolution**. Exhibit D is stricken from the Escrow Agreement. The following language is stricken from Section10. Limited Waiver of Sovereign Immunity. G. Resolution:

> "and setting forth the names of the Indemnities and others entitled to the protections and benefit of the Amended Ordinance. Such Amendment Ordinance shall be in the form and substance shown in Exhibit D, attached hereto and made a part hereof."

**H.** **<u>Conflict</u>**. To the extent that the terms of this Amendment conflict with the Escrow Agreement, the terms of this Amendment shall control.

**I.** **<u>Counterparts</u>**. This Amendment may be executed in counterparts each of which shall be deemed and original and all of which together shall constitute one and the same agreement.

**IN WITNESS WHEREOF,** the Parties have executed this Amendment.

UNITED AUBURN INDIAN COMMUNITY

______________________________________
By:
Its
Dated:______________________________

Agent

U.S. BANK NATIONAL ASSOCIATION

______________________________________
By:
Its:

Dated: ___________________________