UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA TAVARES, DOLLY SUEHEAD, DONNA CAESAR, and BARBARA SUEHEAD,<br><br>Petitioners,<br><br>v.<br><br>GENE WHITEHOUSE, CALVIN MOMAN, BRENDA ADAMS, JOHN WILLIAMS, and DANNY REY, in their official capacities as members of the Tribal Council of the United Auburn Indian Community,<br><br>Respondents. | No. 2:13-cv-02101-TLN-CKD<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on Respondents' Motion to Dismiss for lack of jurisdiction. (ECF No. 12.) Petitioners are members of the Auburn Indian Community. Through this action, Petitioners challenge their punishment imposed by the Tribal Council of the United Auburn Indian Community. Respondents, members of the Tribal Council, seek dismissal, arguing essentially this case concerns internal tribal matters, and therefore this Court lacks jurisdiction. Petitioners oppose dismissal arguing their petition is within the Court's jurisdiction under the Indian Civil Rights Act of 1968 ("ICRA"), 25 U.S.C. § 1303, because their exclusion from tribal lands and suspension of per capita gaming benefits—although temporary—constitute

1

1  "detention" within the meaning of the statute.  The court heard oral argument on January 30,
2  2014.  Elliot R. Peters appeared for respondents, and Andrew W. Stroud appeared for petitioners.
3  Jesse Basbaum and Jo W. Golub were also present for respondents.

4       Petitioners' application for federal habeas relief raises troubling questions about the
5  fundamental fairness of Petitioner Tavares's continuing expulsion from her tribal homelands.
6  These larger questions, however, are not currently before the Court.  Instead, the Court analyzes
7  the narrow issue raised by Respondents' motion: whether Petitioners' punishment was so severe a
8  restraint on liberty it constitutes "detention" sufficient to invoke this Court's federal habeas
9  corpus jurisdiction under ICRA.  This issue is discussed below, informed by the applicable law,
10 the record in this case, and the parties' helpful briefs and oral arguments.

11 **BACKGROUND**

12      This case arises from a dispute over tribal management.  The general contours of the
13 underlying dispute are as follows.  Petitioners initiated an unsuccessful recall campaign
14 attempting to remove Respondents, members of the Tribal Council, from office.  Afterwards, the
15 Tribal Council determined Petitioners had violated a Tribal ordinance prohibiting defamation;
16 Petitioners allege their punishment was imposed in retaliation for the recall campaign.  Petitioners
17 argue their punishment constitutes banishment, invoking this Court's ICRA habeas jurisdiction.
18 Since Petitioners' claim challenges the actions of their Tribal Government, this Court's review is
19 informed by the peculiar principles of Indian sovereign immunity,[1] which are discussed briefly
20 below, before the factual background of this dispute is recounted in greater detail.

21      **A.    Legal Background—Indian Sovereign Immunity and ICRA**

22      Under established United States Supreme Court precedent, American Indian tribes are
23 separate sovereigns immune from suit unless Congress decides to abrogate their immunity.  *See*
24 *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55–58 (1978) ("Indian tribes have long been
25 recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign

---

26
27 [1] *See* Angela L. Riley, *(Tribal) Sovereignty and Illiberalism*, 95 CAL. L. REV. 799, 802 (2007) ("American Indian tribes do not neatly fit into existing legal paradigms because they inhabit a strange sovereign space in the U.S. legal system, one which they alone occupy."); *see also Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831)
28 (Marshall, C.J.) (observing that Indian tribes "are correctly perhaps . . . denominated domestic dependent nations.").

2

powers . . . . subject to the superior and plenary control of Congress." (citations omitted)).

In response to perceived abuses in the administration of criminal justice to tribe members, in 1968, Congress chose to exercise its plenary authority and to abrogate Indian tribal immunity in part through the Indian Civil Rights Act ("ICRA"), 29 U.S.C. §§ 1301–1304. *See Santa Clara Pueblo*, 436 U.S. at 71 ("Congress['s] . . . legislative investigation revealed that . . . serious abuses of tribal power had occurred in the administration of criminal justice."). Section 1302 of the Act extends several (but not all) of the civil rights protections contained in the Bill of Rights to Indian tribe members, including many First Amendment protections and due process. The statute provides:

> No Indian tribe in exercising powers of self-government shall—
>
> **(1)** make or enforce any law prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances;
>
> . . .
>
> **(8)** deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;
>
> **(9)** pass any bill of attainder or ex post facto law; or
>
> **(10)** deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons.

25 U.S.C. § 1302(a).

The substantive civil rights contained in section 1302, however, are not accompanied by an express cause of action for declaratory or injunctive relief against Tribal officers. *See Santa Clara Pueblo*, 436 U.S. 59–60. In *Santa Clara Pueblo*, the Supreme Court held that the substantive civil rights guarantees contained in ICRA section "1302 do[] not impliedly authorize actions for declaratory or injunctive relief against either the tribe or its officers." *Id.* at 72.

Thus, the exclusive means to enforce ICRA's civil rights protections in federal court is through a petition for writ of habeas corpus under section 1303. *Bressi v. Ford*, 575 F.3d 891, 896 n.6 (9th Cir. 2009) ("[E]xcept for habeas corpus challenges, any private right of action under

[the Indian Civil Rights] Act lies only in tribal court.").

### B.   Factual Background[2]

Petitioners are four members of the federally recognized United Auburn Indian Community ("Tribe"). In addition to being a member, Petitioner Jessica Tavares served as the Chairperson of the Auburn Indian Tribal Council from 1996 until 2009, and Petitioner Dolly Suehead also served on the Tribal Council during the same period. Respondents are the members of the Tribal Council that imposed the punishments challenged through this action, and they are being sued in their official capacities.

#### *1.   Underlying Dispute—The Recall Petition*

In 2011, Petitioners initiated a recall campaign against the Tribal Council members alleging the Council members:

- misrepresented to tribal members that a full, independent forensic financial audit of the Tribe had been conducted, and denied tribal members access to the "limited audit" that was conducted,

- refused to take action to reclaim close to $25 million paid to the tribe's outside attorney, Howard Dickstein, and

- refused to allow Tribal Council election candidates observe the casting of ballots to ensure the integrity of the election.

(Pet. Writ of Habeas Corpus Under Indian Civil Rights Act ("Pet.") ¶ 10, ECF No. 1.)

Petitioners submitted the recall petition to the Election Committee of the Tribal Council in November 2011. The Tribal Council appoints the members of the Election Committee. Petitioners allege the Election Committee is, therefore, "subject to . . . [the] control of the five-member Tribal Council" such that the recall petition "was essentially submitted to and controlled by the same Tribal Council members to whom the recall effort was directed." (*Id.* ¶ 8.)[3] As part of their recall petition, Petitioners obtained the signatures of seventy-four tribal members, "which [P]etitioners believe constituted 40% of the tribal membership as required for recall under the Tribe's constitution." (*Id.* ¶ 9.)

---

[2] The following factual background is drawn from Petitioners' application for federal habeas relief under ICRA (ECF No. 1), unless otherwise noted.

[3] Petitioners Tavares and Suehead were also running for office on the Tribal Council in the regular election, held one month later in December 2011, against two then-current members of the Tribal Council. (Pet. ¶ 8.)

4

As part of their recall campaign, Petitioners circulated a press release to local media outlets that detailed Petitioners' allegations of financial mismanagement. Petitioners explain they circulated the press release to communicate the specifics of their grievances to the entire tribal membership: "Because the 2011 Tribal Council refused to release the mailing addresses of Tribe members, petitioners sought to communicate their grievances to the entire tribal membership through the media in the form of a press release." (*Id.* ¶ 11.)

The Tribal Council reacted to the press release swiftly. Two days after Petitioners circulated the press release, on November 9, 2011, the Tribal Council "mailed a one-page statement to all tribal members accusing [P]etitioners of making a 'public display of our tribal business in the local newspapers and on television,' calling [P]etitioners' statements in the Recall Petition and press release 'defamatory and malicious,'" and "characterizing [P]etitioners' [statements] as having a 'negative impact on the reputation of our Tribe.'" (*Id.*) The letter also indicated the Tribal Council "will be taking appropriate disciplinary and legal action." (*Id.*)

The next day, on November 10, 2011, the Election Committee notified Petitioners that their recall petition had been rejected. The Election Committee explained that it rejected the petition in part because of "the failure to obtain the requisite support of 40% of the membership." (*Id.* ¶ 12.) The Election Committee "did not indicate how many signatures were necessary to meet the 40% threshold," and Petitioners allege the 40% threshold "was satisfied by the seventy-four signatures they . . . had gathered." (*Id.*)

The Election Committee also explained it rejected the recall petition because the petition "did not comply with a newly adopted Election Ordinance . . . that required each signature . . . to be individually witnessed by a notary public." (*Id.* ¶ 13.) Petitioners allege the ordinance was drafted by the Tribal Council's outside attorney, Howard Dickstein—the same attorney Petitioners through their recall petition alleged "bilked" $25 million from the Tribe. (*Id.*) Petitioners also allege they asked for applicable election ordinances before initiating their recall campaign, and the Tribe gave them "a version of the ordinance that did not contain the individual notarization requirement." (*Id.*)

///

5

### *2.    Disciplinary Action and the Severity of the Punishments*

Over the next week or so, beginning on November 15, 2011, the Tribal Council sent Petitioners notices of discipline for misrepresentations against the Tribe for defamation—based on several false claims to the media.  Petitioners allege that the tribal ordinance, under which Petitioners were "convicted," was also drafted by Dickstein.  (*Id.* ¶ 15.)  The discipline imposed included:

- Banning Petitioners "from all tribal lands and facilities" for a period of four years (in the case of three members) and ten years (in the case of Tavares), and
- Witholding per capita distributions of casino profits for six months (in the case of three members) and four years (in the case of Tavares).

(*Id.* ¶¶ 16–17.)

Petitioners claim their punishments constitute a severe restraint on their liberty.  Petitioner Tavares avers that as a result of the discipline, she could not attend her grandchildren's school graduations or "walk [her] grandchildren to class."  (Decl. Jessica Tavares ¶ 8, ECF No. 19.) Petitioner Tavares also declares: "One of the most important aspects of Tribe membership is the ability to participate in the ceremonies and events of the Tribe's culture and heritage."  (*Id.* ¶ 7.) As a result of her punishment, she cannot participate in tribal ceremonies and events, and cannot attend and participate in the Tribe's annual cultural fair.  Petitioner Tavares states she and the other petitioners "have had to sit outside the fence and look on, as if we were criminals or untouchables."  (*Id.*)  Petitioner Tavares avers that as the former Tribal Council Chair, "many members of the Tribe referred to [her] as 'Chief,'" ¶ 2, and that an "important cultural aspect of [the] Tribe is respect for . . . elders"; however, she and Petitioner Suehead, "a well-respected elder member of [the] Tribe," cannot go to the Senior Center on tribal lands.  (*Id.* ¶¶ 2, 9.)

Moreover, Petitioner Tavares declares she has been stripped of her political rights and that her punishment effectively prevents her "from being a real member of the tribe [she] once led." (*Id.* ¶ 12.)  Specifically, Tavares's punishment makes it impossible for her to participate in the Tribe's political activities:

///

///

> I cannot run for office or attend meetings to voice my opinion on Tribal matters. Tribal records are kept at the Tribe's administrative offices, yet I cannot go and view those records in order to keep up with the Tribe's finances or other aspects of tribal affairs. I have been effectively silenced.

(*Id.* ¶ 10.)

The following facts tend to undermine a finding that the punishments in this case constitute a severe restraint on liberty. Under the terms of the discipline imposed by the tribe, Petitioners were excluded from Tribe-sponsored events and were excluded from tribal properties and surrounding facilities including "Tribal Offices, Thunder Valley Casino, the UAIC School, Health and Wellness facilities at the [Auburn] Rancheria, and[] the Park at the Rancheria." (Decl. Jesse Basbaum, Ex. F, Letter to Barbara Suehead, Nov. 29, 2011, at ¶ 1, ECF No. 15-6.) Thus, Petitioners continued to have access to most of the historic Auburn Rancheria, which is privately owned and, therefore, does not constitute "tribal lands." Petitioners did not live on tribal lands and therefore were not removed from their homes. (Decl. Brian Guth ¶ 20, ECF No. 14.) Moreover, Petitioners retained their tribal medical benefits and retained their right to vote in tribal elections through absentee ballot. (*Id.* ¶¶ 16–17.)

### 3. *The Process of Imposing and Appealing the Punishments*

The punishments were imposed without prior notice or an opportunity for a hearing. (Pet. ¶ 33, ECF No. 1.) After the punishments were imposed, Petitioners were afforded an opportunity to contest their punishments at a meeting before the Tribal Council—"the same body that imposed the sanction—as the sole avenue of redress available to challenge their sentences of banishment . . . ." (*Id.* ¶ 18.)

Petitioners claim this meeting lacked adequate procedural protections. At the meeting before the Tribal Council, each Petitioner was allowed to have one person present on her behalf, and that person could be an attorney; but, Petitioners were precluded from presenting or confronting witnesses. (Pet. ¶ 18, ECF No. 1.) Petitioners requested the presence of a stenographer or a device to videotape or make an audio recording of the proceeding: these requests were denied, and there is no record. (*Compare* Decl. Fred J. Hiestand, Ex. 2, at 2, ECF No. 18-2 (requesting the tribal Council to "inform me in writing that the Council will not object

1  to our engagement of a court reporter," or "[i]f the Council does object to our use of a certified
2  stenographer, may we record the scheduled 'meeting' by video or audio?"), *with Id.*, Ex. 3, ECF
3  No. 18-3 (responding "your request is denied" and your specific "request for a 'certified court
4  reporter' [is] not appropriate for this venue").)

5  The Tribal Council upheld Petitioners' punishments.  (Pet. ¶ 20, ECF No. 1.)

6  Under the Tribe's Amended Plan for Allocation of Gaming Revenue, Petitioners could
7  appeal, to the Tribe's Appeals Board, the withholding of their tribal gaming benefits only; but the
8  Tribal Council's decision to exclude Petitioners from tribal lands could not be appealed.  The
9  Tribe's Appeals Board consists "'of three members appointed by the Tribal Council'—that is, the
10 same Tribal Council that had ordered that [P]etitioners be punished." (*Id.* ¶ 22.)  On appeal to the
11 Tribe's Appeals Board, the per capita distribution withholding punishment was reduced by six
12 months for Petitioner Tavares (from four years, to three-and-one-half years) and by one month for
13 other three Petitioners (from six months, to five months).  (*Id.* ¶¶ 20, 44.)

14 Petitioners brought their petition for habeas corpus asserting they were banished, and their
15 tribal gaming benefits withheld, without due process, without a fair trial, and in retaliation for
16 protected political speech in violation of ICRA.  Respondents move to dismiss for lack of
17 jurisdiction.

18 **STANDARD**

19 Federal courts are courts of limited jurisdiction and, until proven otherwise, cases lie
20 outside the jurisdiction of the court.  *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375,
21 377 (1994).  The burden of establishing subject matter jurisdiction "rests upon the party asserting
22 jurisdiction."  *Id.* (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182–83
23 (1936)).  A party may challenge a court's subject matter jurisdiction through a motion under
24 Federal Rule of Civil Procedure 12(b)(1).  The challenge "can be either facial or factual."  *White*
25 *v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  A facial challenge attacks the pleadings as
26 insufficient to invoke federal jurisdiction; whereas a factual challenge contests the veracity of the
27 jurisdictional pleadings.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In
28 a factual attack on jurisdiction, a court need not consider the allegations of the complaint as true

8

but may look beyond the complaint to evaluate jurisdictional facts. *Id.*

"Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Id.* (quoting *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003)). "A court may not resolve genuinely disputed facts where 'the question of jurisdiction is dependent on the resolution of factual issues going to the merits.'" *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (citing *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983)).

## ANALYSIS

Respondents move to dismiss under Rule 12(b)(1) primarily arguing Petitioners' punishments do not "satisfy the 'detention' requirement in § 1303" of ICRA. (Mem. P. & A. in Supp. of Resp'ts' Mot. to Dismiss ("Mot. to Dismiss") 7:7–10, ECF No. 13.) Respondents also assert Petitioners' application for federal habeas relief is moot with respect to three of the four petitioners; the application should be dismissed because it is premised on civil (rather than criminal) proceedings; and several of the claims contained in Petitioners' application for habeas relief are unexhausted. Petitioners oppose arguing the Court has jurisdiction under ICRA and, in the alternative, has jurisdiction under *Ex parte Young*, 209 U.S. 123 (1908). Since Respondents' argument that the Court lacks ICRA jurisdiction has the potential to dispose of all claims,[4] the Court's analysis begins there.

    **A.**    **Federal Habeas Jurisdiction Under ICRA**

Respondents move to dismiss Petitioners' application for federal habeas relief for lack of subject matter jurisdiction. Respondents rely primarily on the Ninth Circuit's decision in *Jeffredo v. Macarro*, 599 F.3d 913 (9th Cir. 2010), in which the court affirmed dismissal of an ICRA habeas petition in part because the "limitation of [petitioners'] access to certain tribal facilities does not amount to a 'detention.'" *Id.* at 919. Petitioners oppose dismissal arguing that under the

---

[4] Since Respondents' argument—that Petitioners Dolly Suehead, Donna Caeser, and Barbara Suehead's claims are moot—does not pertain to Petitioner Tavares, the Court analyzes the ICRA habeas jurisdictional argument first.

Second Circuit's decision in *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874 (2d Cir. 1996) "banishment is a sufficient restraint on liberty to constitute 'detention' within the meaning of § 1303, thereby warranting the exercise of habeas jurisdiction." (Pet'rs' Opp'n to Resp'ts' Mot. to Dismiss ("Opp'n") 8:5–24, ECF No. 17.)  Petitioners also point to an Eastern District of California decision in *Quair v. Sisco*, 359 F. Supp. 2d 948 (E.D. Cal. 2004) as persuasive authority for the proposition that "banishment by itself need not be 'forever' to invoke habeas review." (Opp'n 9:14–16.)

Federal courts lack jurisdiction over tribal matters unless the party invoking federal jurisdiction can meet the requirements of § 1303 of ICRA. *Bressi*, 575 F.3d at 896 n.6.  Section 1303 provides: "The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his *detention* by order of an Indian tribe." 25 U.S.C. § 1303 (emphasis added).  The Ninth Circuit has held "[t]he term 'detention' in the statute must be interpreted similarly to the 'in custody' requirement in other habeas contexts." *Jeffredo*, 599 F.3d at 918 (citing *Moore v. Nelson*, 270 F.3d 789, 791 (9th Cir. 2001)).  Therefore, a federal court may review an ICRA habeas petition if the petitioner is "detained" or "in custody." *Id.* at 918–19.

Even so, "actual *physical* custody is not a jurisdictional prerequisite for federal habeas review" under ICRA. *Poodry*, 85 F.3d at 893–94.  The Ninth Circuit has held that in order to establish "detention" in the absence of physical custody—and thereby jurisdiction under § 1303—the petitioner must establish "'a severe actual or potential restraint on liberty.'" *Id.* at 919 (quoting *Poodry*, 85 F.3d at 880).  In this regard the Ninth Circuit follows the Second Circuit. *Id.* ("We agree with our colleagues on the Second Circuit and hold that § 1303 does require 'a severe actual or potential restraint on liberty.'" (quoting *Poodry*, 85 F.3d at 880)).

Permanent banishment is a sufficiently severe restraint on liberty to constitute "detention" and invoke federal habeas jurisdiction under § 1303 of ICRA.  In *Poodry*, the petitioners accused various members of the Tonawanda Band Council of Chiefs of misusing tribal funds, concealing business records, and interfering with tribal elections. 85 F.3d at 877–78.  The petitioners formed an interim tribal council. *Id.* at 878.  The Council of Chiefs then notified the petitioners that their

10

"actions to overthrow . . . the traditional government of the Tonawanda Band . . . are considered treason," and the petitioners were permanently stripped of their tribal citizenship, told to leave their homes, and told that they would be escorted to the edge of tribal lands—they had been permanently banished. *Id.* The district court granted the respondents' motion to dismiss for lack of jurisdiction, holding that banishment did not invoke ICRA's habeas corpus jurisdiction; the Second Circuit reversed. *Id.* at 879, 901.

The court in *Poodry* held the "petitioners have . . . demonstrated a sufficiently severe restraint on liberty" to meet the "detention" prerequisite for habeas review. *Id.* at 901. In reaching this conclusion, the court reasoned that the banishment order severely restrained the petitioners' liberty because, under that order, "the petitioners may be removed from the Tonawanda Reservation at any time." *Id.* at 895. Moreover, the court reasoned the "coerced . . . deprivation of the petitioners' membership and their social and cultural affiliation" is more severe than the punishment of imprisonment, as it "works a complete destruction of one's social, cultural, and political existence," *id.* at 897, and because under tribal law, imprisonment accompanies lesser crimes: "We believe that Congress could not have intended to permit a tribe to circumvent the ICRA's habeas provision by permanently banishing, rather than imprisoning, members 'convicted' of the offense of treason." *Id.* at 895. The court also observed: "the holding of the case may have significance in the future. This is especially true at a time when some Indian tribal communities have achieved unusual opportunities for wealth, thereby unavoidably creating incentives for dominant elites to 'banish' irksome dissidents for 'treason.'" *Id.* at 897.

If a tribe permanently disenrolls its members and excludes them from some, but not all, tribal facilities, then those members have not suffered a sufficiently severe restraint on liberty to constitute detention and invoke federal habeas jurisdiction under ICRA. In *Jeffredo*, the Enrollment Committee of the Pechanga Tribe disenrolled several of the Tribe's members "for failure to prove lineal descent from an original Pechanga Temecula person." 599 F.3d at 917. The disenrolled members filed a petition for writ of habeas corpus under ICRA in a federal district court; the petition was dismissed for lack of jurisdiction, and the Ninth Circuit affirmed. *Id.* at 915, 917. The court distinguished *Poodry*, noting that "disenrollment does not mean that a

11

1  person is banished from the Pechanga Reservation," and that the petitioners' "movements have
2  not been restricted on the Reservation." *Id.* at 916, 919. The court rejected the petitioners'
3  argument that they have been detained because "they have been denied access to the Senior
4  Citizens' Center, cannot go to the health clinic, and their children cannot go to tribal school." *Id.*
5  at 918–19. The court explained: "This is not *Poodry*. In *Poodry*, the petitioners were convicted
6  of treason, sentenced to permanent banishment, and permanently lost any and all rights afforded
7  to tribal members. Appellants have not been convicted, sentenced, or permanently banished. . . .
8  [T]herefore . . . the limitation of Appellants' access to certain tribal facilities does not amount to a
9  'detention.'" *Id.* (citation omitted) (citing *Poodry*, 85 F.3d at 876, 878). The court also noted
10 that, "[a] tribe's right to define its own membership for tribal purposes has long been recognized
11 as central to its existence as an independent political community." *Id.* at 920 (internal quotation
12 marks omitted) (quoting *Santa Clara Pueblo*, 436 U.S. at 71 n.32).

13       Here, contrary to Respondents' argument that *Jeffredo* is controlling, this case lies
14 between the permanent banishment for treason in *Poodry* and the disenrollment for failure to
15 prove lineal descent in *Jeffredo*. Unlike *Jeffredo*, in which those petitioners' movements on tribal
16 lands were not restricted, here, Petitioners were excluded from all Auburn Indian tribal lands.
17 Moreover, the Enrollment Committee's decision in *Jeffredo*—that those petitioners were not
18 lineal descendants of Pechanga Temecula persons—was within the Indian tribe's "power to
19 define membership as it chooses," 599 F.3d at 920 (quoting *Williams v. Gover*, 490 F.3d 785, 789
20 (9th Cir. 2007)); whereas here, the Auburn Tribal Council decided to exclude these Petitioners
21 from all tribal lands for "defamatory statements" critical of the Tribal Council and allegedly in
22 retaliation for protected political speech. Unlike the defamation decision in the election-
23 campaign context here, the decision in *Jeffredo*—whether a person is a lineal descendant—is, as
24 the Supreme Court observed in *Santa Clara Pueblo v. Martinez*, "particularly . . . delicate": "To
25 abrogate tribal decisions, particularly in the delicate area of membership, for whatever 'good'
26 reasons, is to destroy cultural identity under the guise of saving it." 436 U.S. at 54 (internal
27 quotation marks omitted).

28       Further, this case is distinguishable from *Poodry* as well. Unlike *Poodry*, the Tribe's

12

1 decision in this case, to ban Petitioners from all tribal lands for several years, was not permanent
2 banishment. Moreover, the Tribe in this case did not decide to permanently strip Petitioners of
3 their tribal citizenship, unlike *Poodry*. In *Poodry*, the court reasoned that permanent banishment
4 was a sufficiently severe restraint on liberty in part because it is akin to denationalization in that it
5 results in "an extraordinarily severe penalty," 85 F.3d at 895–96 (quoting *Klapprott v. United*
6 *States*, 335 U.S. 601, 611–12 (1949)), since the result is the "total destruction of the individual's
7 status in organized society," *id.* at 896 (quoting *Trop v. Dulles*, 356 U.S. 86, 101–02 (1958)
8 (plurality opinion) (Warren, C.J.)).[5] Petitioners' punishment in this case does not implicate this
9 reasoning from *Poodry* because Petitioners either retain their political status in the Tribe, or will
10 regain that status after a period of time. Thus, Petitioners have not suffered a permanent "total
11 destruction" of their "social, cultural, and political existence," unlike the petitioners in *Poodry*.
12 *Id.* at 896–97.

13 Thus, neither *Poodry* nor *Jeffredo* resolve this case, although the principles articulated in
14 those decisions inform the Court's analysis here. Both cases teach that this Court should examine
15 the nature and severity of Petitioners' punishment to determine whether Petitioners' liberty has
16 been sufficiently restrained to constitute "detention." *See Jeffredo*, 599 F.3d at 919 (examining
17 the severity of the restraints on the petitioners' liberty); *Poodry*, 85 F.3d at 895 (identifying the
18 specific restraints on the petitioners' liberty).

19 Here, Petitioners argue their liberty has been severely restrained because they have been
20 excluded from all tribal lands and thereby have been precluded from participating in tribal
21 ceremonies and cultural events. The severity of the restraint on Petitioners' liberty inflicted
22 through their exclusion from all tribal lands is magnified by the special connection between
23 American Indians and their ancestral homeland,[6] and the cultural destruction wrought by the

---

[5] The court in *Poodry* also noted that, in *Trop*, the U.S. Supreme Court held that the penalty of denationalization of a natural-born citizen after conviction for desertion was unconstitutional as "a form of punishment more primitive than torture." 85 F.3d at 896 (quoting *Trop*, 356 U.S. at 101–02).

[6] Riley, *supra* note 1, at 846–47 & n. 360 (describing the impact of federal allotment policy under the Dawes Act of 1887 as having a "profound irreversible effect" on American Indians' "sense of community and [their] social structure" (quoting *The Native Americans* (TBS television broadcast 1992) (interview with former Principal Chief of the Cherokee Nation of Oklahoma, Wilma Mankiller))).

13

tragic history of land removal and allotment.[7]  Moreover, Petitioner Tavares was prevented from attending her grandchildren's school graduations and cannot walk her grandchildren to class. Petitioner Tavares avers an "important cultural aspect of our Tribe is respect for our elders." (Decl. Tavares ¶ 9, ECF No. 19.)  Yet, Petitioners, two of whom are "well-respected elders," have also been unable to visit the Tribe's Senior Center.  Further, Petitioners were active in tribal politics before their expulsion: Petitioner Tavares was the former Chair of the Tribal Council and Petitioner Suehead served on the Council.  Under the exclusion order, Petitioners could not attend Tribal Council meetings to participate or otherwise engage in political activities.  Petitioner Tavares declares: "I have been effectively silenced.  My most precious liberties, my freedom of speech and freedom of association, have been taken from me."  (*Id.* ¶ 10.)

Yet, Petitioners' punishments in this case were, in many ways, not as severe a restraint on liberty as the punishments in *Jeffredo* and *Poodry*.  Each Petitioner retained the right to vote through absentee ballot.  Petitioners also retained their tribal medical benefits.  Unlike *Jeffredo*, none of the Petitioners herein were disenrolled from membership in the Tribe and all Petitioners remained members of the Tribe.  Also, because some of the historic Auburn Rancheria is on private land, Petitioners continue to have access to those portions of the Rancheria that are not tribal land.  Respondents assert, therefore, "unlike the petitioners in *Poodry*, the Petitioners in this case were not excluded from the Tribe's central and historic residential community."  (Mot. to Dismiss 13:1–7, ECF No. 13.)

The Court finds Petitioners have not met their burden to show their exclusion from tribal lands and suspension of gaming benefits are a sufficiently severe restraint on liberty to constitute "detention" and establish jurisdiction in this case.  Petitioners are not confined to a particular area. *Cf. Jones v. Cunningham*, 371 U.S. 236, 242 (1963) (finding parolee remained "in custody" outside of prison because "Petitioner is confined by the parole order to a particular community,

---

[7] *See* Riley, *supra* note 1, at 847 n. 361 (quoting President Theodore Roosevelt as stating "The General Allotment Act is a mighty pulverizing engine to break up the tribal mass.  It acts directly upon the family and the individual"); *see also* Padraic I. McCoy, *The Land Must Hold the People: Native Modes of Territoriality and Contemporary Tribal Justifications for Placing Land into Trust Through 25 C.F.R. Part 151*, 27 AM. INDIAN L. REV. 421, 449 (2003) ("Allotment's impact on communally held land and important sacred and cultural sites opened the door for the eventual destruction of tribal life-ways. . . . [T]he blow was less economic than psychological and even spiritual.  A way of life had been smashed; a value system destroyed.")

house, and job at the sufferance of his parole officer."). Moreover, as Respondents point out, unlike *Poodry*, Petitioners exclusion from tribal lands is temporary. Further, as Respondents stated at oral argument, Petitioners have not pointed to a single case in which a federal court asserted jurisdiction to review a tribe's decision to temporarily exclude members from all tribal lands. Petitioners' reliance on *Quair v. Sisco*, 359 F. Supp. 2d 948 (E.D. Cal. 2004) and *Sweet v. Hinzman*, 634 F. Supp. 2d 1196 (W.D. Wash. 2008) is misplaced in this regard because, as Respondents point out in reply, both of these cases involved challenges to permanent banishment.

Petitioners' argument is not without logical force, however. As Petitioners stated at oral argument, in the ordinary criminal habeas context, the temporary duration of the detention is irrelevant: just as there is habeas jurisdiction over a ten-year prison sentence and a permanent sentence of life without parole alike, so too should there be federal habeas jurisdiction over temporary exclusion and permanent exclusion from tribal lands alike, Petitioners contend. Petitioners also point out the Ninth Circuit instructs courts to look to cases in the ordinary criminal habeas context for guidance. *See Jeffredo*, 599 F.3d at 918 ("The term 'detention' in [ICRA] must be interpreted similarly to the 'in custody' requirement in other habeas contexts."). Moreover, the restraint in this case was severe: like an incarcerated prisoner, Petitioner Tavares could not attend graduations of relatives, and Petitioners could not participate in tribal political activities, ceremonies, and events. Further, Respondents cannot point to a single decision in which an Indian tribe excluded a member from all tribal lands (even for a temporary period), and a federal court declined to exercise jurisdiction after finding the restraint on liberty insufficiently severe.

Nonetheless, because the burden is on Petitioners as the proponents of federal jurisdiction, the Court hesitates to expand the scope of federal jurisdiction in the absence of any authority. The presumption that the Court lacks jurisdiction, *Kokkonen*, 511 U.S. at 377, is of particular force here because Petitioners challenge the decision of an Indian tribal government. As the Supreme Court has "repeatedly emphasized, Congress' authority over Indian matters is extraordinarily broad, and the role of courts in adjusting relations between and among tribes and their members correspondingly *restrained*." *Santa Clara Pueblo*, 436 U.S. at 72 (emphasis

added); *cf. Lewis v. Norton*, 424 F.3d 959, 960 (9th Cir. 2005) ("Although their claim . . . appears to be a strong one, . . . their claim cannot survive the double jurisdictional whammy of sovereign immunity and lack of federal court jurisdiction to intervene in tribal membership disputes."). Thus, as the Ninth Circuit observed in *Jeffredo* and *Lewis*, even though "this case is deeply troubling on the level of fundamental substantive justice," the Court is "not in a position to modify . . . doctrines of sovereign immunity. This is a matter in the hands of a higher authority than our court." *Jeffredo*, 599 F.3d at 921 (quoting *Lewis*, 424 F.3d at 963).

Moreover, the Court's conclusion—that temporary exclusion is not a severe enough restraint on liberty to constitute "detention"—is consistent with persuasive authority declining jurisdiction to review restraints short of permanent banishment. For example, federal courts have held that they lack habeas jurisdiction under ICRA over Tribe actions including:

- termination of employment, health care, and annuity payments, *Shenandoah v. U.S. Dep't of Interior*, 159 F.3d 708, 714 (2d Cir. 1998),

- a refusal to certify a candidate for a Tribal Council election, *Lewis v. White Mountain Apache Tribe*, No. 12-cv-8073, 2013 WL 510111, at *6 (D. Ariz. Jan. 24, 2013),

- unlawful detainer and eviction orders, *Quitquit v. Robinson Rancheria Citizens Bus. Council*, No. 11-c-0983, 2011 WL 2607172, at *7–8 (N.D. Cal. July 1, 2011); *Shenandoah v. Halbritter*, 275 F. Supp. 2d 279, 285–86 (N.D.N.Y. 2003), and

- the temporary suspension of a license to practice as a tribal-court advocate, *Poulson v. Tribal Court for the Ute Indian Tribe of the Uintah & Ouray Reservation*, No. 2:12-cv-497, 2013 WL 1367045, at *2 (D. Utah Apr. 4, 2013).

As these decisions reflect, "short of an order of permanent banishment, federal courts have been reluctant to find tribal restraints severe enough to warrant habeas review." *Mitchell v. Seneca Nation of Indians*, No. 12-cv-119-A, 2013 WL 1337299, at *3–4 (W.D.N.Y. Mar. 29, 2013) (holding that tribal resolution prohibiting the petitioner from entering tribal buildings, businesses, and health care facilities "is not a restraint severe enough to permit habeas corpus review").

For the foregoing reasons and in accordance with the courts that have considered similar questions, the Court finds Petitioners have not met their burden to show their temporary exclusion from tribal lands constitutes "detention." Therefore, Respondents' Motion to Dismiss

for lack of jurisdiction is granted, and the Court need not and does not consider Respondents' mootness and exhaustion arguments, or Respondents' argument that the civil nature of this dispute precludes habeas review.

### B.      Jurisdiction Under *Ex parte Young*

Petitioners' application for federal habeas relief under ICRA also asserts the "Court has jurisdiction over all [R]espondents, who collectively constitute the current Tribal Council . . . pursuant to the doctrine of *Ex [p]arte Young*." (Pet. ¶ 4(b), ECF No. 1.)  Respondents move to dismiss, arguing the *Ex parte Young* doctrine "is an exception to the Eleventh Amendment's guarantee of sovereign immunity," and "cannot serve as an independent basis for jurisdiction" because there remains "no statutory basis for [Petitioners'] suit." (Mot. to Dismiss 16:18–17:3, ECF No. 13.)  In their opposition to the motion to dismiss, Petitioners appear to clarify that their *Ex parte Young* argument is intended only to allow Petitioners to litigate their "slush fund" claim: that "third parties, who hold no membership or office in the Tribe, are empowered . . . to dip into a tribally-funded account," which Petitioners describe as a "slush fund," with "no advance notice to the Tribe." (Opp'n 16:24–18:8, ECF No. 17.)  Petitioners' argument appears to address Respondents' contention that the "slush fund" claims were not presented to the Tribe and are therefore unexhausted.  (*See id.*)

*Ex parte Young* does not provide an independent basis of federal jurisdiction, particularly if "Congress has created a remedial scheme for the enforcement of a particular federal right." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996).  The Supreme Court in *Santa Clara Pueblo* rejected the argument that *Ex parte Young* permits an implied private right of action to enforce the civil rights protections contained in § 1302 of ICRA.  The Court concluded "Congress, aware of the intrusive effect of federal judicial review upon tribal self-government, intended to create only a limited mechanism for such review, namely, that provided for expressly in § 1303." *Santa Clara Pueblo*, 436 U.S. at 70.  Therefore, since Petitioner cannot meet the requirements for ICRA habeas jurisdiction under § 1303 for the reasons set forth above, *Ex parte Young* does not provide an alternative jurisdictional basis to challenge the Tribe's actions.

///

**CONCLUSION**

Based on the foregoing, Respondents' Motion to Dismiss for lack of jurisdiction (ECF No. 12) is GRANTED.  The Petition for Writ of Habeas Corpus Under the Indian Civil Rights Act is DISMISSED.  The Clerk of the Court is directed to close the case.

Dated: March 20, 2014

Troy L. Nunley
United States District Judge